IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANDREW BROWN | ) | |
| | ) | Civil Action No. 14 – 1085 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Magistrate Judge Lisa Pupo Lenihan |
| | ) | |
| SHRADER, *et al.,* | ) | |
| | ) | ECF No. 43 |
| Defendants. | ) | |
| | ) | |

# **MEMORANDUM OPINION**[1]

This is a civil rights action under 42 U.S.C. § 1983 filed through counsel by Andrew Brown ("Plaintiff") alleging violations of his rights under the Eighth and Fourteenth Amendments to the United States Constitution. (ECF No. 1.) The following individuals were named as Defendants in Plaintiff's Amended Complaint that was filed on September 10, 2014, (ECF No. 2): Major Haywood,[2] Security Lieutenant Shrader, Unit Manager Lindley, Unit Manager Macknair, Nurse McAnany, and Nurse Fleming (collectively, the "Corrections Defendants"); and Dr. Jin and PA Trimea (collectively, the "Medical Defendants"). Defendant Nurse Fleming was dismissed for Plaintiff's failure to state a claim against her by Order of Court dated September 14, 2015. (ECF No. 20.) Additionally, the Medical Defendants were subsequently dismissed by joint stipulation of the parties on March 25, 2016. (ECF Nos. 31, 32.)

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c)(1), the parties have voluntarily consented to have a United States Magistrate Judge conduct proceedings in this case, including the entry of a final judgment. (ECF Nos. 6, 10.)

[2] Major Haywood was Security Captain at the time the events giving rise to this action occurred. (ECF No. 46-8, p.5.)

Now pending before the Court is a Motion for Summary Judgment filed by the remaining Corrections Defendants, (ECF No. 43), and, for the following reasons, the Motion will be denied as to all Defendants.

## I. Factual Background

### A. Facts Not in Dispute

At breakfast on the morning on November 5, 2012, Plaintiff was repeatedly punched by another inmate named Arnold ("Inmate Arnold'), (ECF No. 51, ¶ 29; No. 58, ¶ 29), who, as a result of the attack, received 90 days in the Restricted Housing Unit ("RHU"), (ECF No. 51, ¶ 30; No. 58, ¶ 30). Fearing for his safety once Inmate Arnold was released from the RHU and put back into the general population, Plaintiff met with Security Lieutenant Shrader to request a separation from Arnold. (ECF No. 51, ¶ 33; No. 58, ¶ 33.) Plaintiff also made requests for the separation on three separate occasions to his unit manager, Unit Manager Lindley; on December 17, 2012, January 6, 2013, and March 18, 2013. (ECF No. 45, ¶¶ 4, 6, 8; No. 51, ¶¶ 4, 6, 8, 37, 39, 42; No. 58, ¶ 37, 39, 42.) Lindley, who testified in her deposition that she was responsible for coordinating the various needs of the inmates while ensuring compliance with proper procedures, forwarded each request to the security department, which had the authority to grant a separation. (ECF No. 45, ¶¶ 2, 3, 5, 7, 9; No. 51, ¶¶ 2, 3, 5, 7, 9.) Lindley also included Security Captain Haywood in her response to Plaintiff. (ECF No. 51, ¶¶ 38, 43; No. 58, ¶¶ 38, 43.)

On March 20, 2013, Plaintiff filed a grievance requesting a separation from Inmate Arnold, although Inmate Arnold was not yet in general population, and claiming that Lindley had failed to act on his multiple request slips seeking a separation. (ECF No. 45, ¶ 10; No. 51, ¶¶ 10, 48, No. 58, ¶ 48.) On either March 26, 2013, Lieutenant Shrader responded to Plaintiff's grievance and explained that Inmate Arnold would remain in administrative custody while the

investigation into Plaintiff's safety concerns was being conducted. (ECF No. 45, ¶ 11; No. 51, ¶¶ 11, 49, 50; No 58, ¶¶ 49, 50.) On March 28, 2013, Lieutenant Shrader denied Plaintiff's grievance because Inmate Arnold was still in administrative custody. (ECF No. 51, ¶ 56; No. 58, ¶ 56.)

On April 22, 2013, Plaintiff provided a statement to security in which he stated that he no longer believed that Inmate Arnold wished him harm. (ECF No. 45, ¶ 15; No. 51, ¶ 15.) Inmate Arnold also provided a written statement in which he stated that he did not have any ill-will toward Plaintiff. (ECF No. 45, ¶ 17; No 51, ¶ 17.)

In June of 2013, Unit Manager Macknair and Nurse McAnany participated in a staffing during which Plaintiff was removed from his employment in the medical department due to job performance. (ECF No. 45, ¶ 18; No. 51, ¶¶ 18, 76; No. 58, ¶ 76.) The rationale proffered by Nurse McAnany for his decision to seek Plaintiff's removal from his job was because Plaintiff insisted on having conversations with inmates in the infirmary and psychiatric observation cells, which was not permitted, and because Plaintiff did not get along with another inmate in the infirmary. (ECF No. 45, ¶ 19; No. 51, ¶, 19.)

On June 9, 2013, Plaintiff submitted a request slip to Ms. Sokol in Inmate Employment, asking for assistance in addressing the issues he raised at the employment hearing. (ECF No. 51, ¶ 85; No. 58, ¶ 85.) On June 19, 2013, Plaintiff received a response from Ms. Sokol saying that she notified Captain Haywood of his concerns. (ECF No. 51, ¶ 86; No. 58, ¶ 86.)

On June 9, 2013, Plaintiff submitted a request slip to Macknair stating, "I/M Arnold said if I don't pay up on commissary pay, I'm getting fucked up for snitching on him. I'm requesting an immediate separation from Arnold!!" (ECF No. 51, ¶¶ 83, 84; No. 58, ¶¶ 83, 84.) On June 19, 2013, Plaintiff submitted another request slip to Macknair requesting that he check on the

3

status of his separation. (ECF No. 51, ¶ 87; No. 58, ¶ 87.) However, there are no notations on either request slip indicative of receipt by any staff member. (ECF No. 51, ¶ 88; No. 58, ¶ 88; No. 52-7, p.2; No. 52-8, p.2.)

On July 5, 2013, Plaintiff sent a request slip to Deputy Winfield with "URGENT!" written on top and explaining that his life was in immediate danger because without a job he could no longer afford to pay Inmate Arnold's associates. (ECF No. 51, ¶ 89; No. 58, ¶ 89.) Captain Haywood responded to Plaintiff's request slip but did not do so until July 12, 2013. (ECF No. 51, ¶ 91; No. 58, ¶¶ 90, 91.) A day earlier, on July 11, 2013, Inmate Arnold and Plaintiff were involved in another altercation. (ECF No. 45, ¶ 26; No. 51, ¶ 26.) In Captain Haywood's response to Plaintiff's request slip, he stated that there was "evidence that the fight with Arnold was staged to facilitate a transfer." (ECF No. 58, ¶ 92; No. 52-3, p.63.)

Plaintiff filed a grievance on July 26, 2013, regarding the Security Department's failure to protect him from the second assault by Inmate Arnold. (ECF No. 51, ¶ 109; No. 58, ¶ 109.) During the investigation into this grievance, Defendants and members of the Security Department stated that they believed the assault was a set up to obtain money. (ECF No. 51, ¶ 111; No. 58, ¶ 111.)

### B. Facts in Dispute

Plaintiff maintains that Inmate Arnold ran an illicit gambling ring at SCI Greene, and, on the morning of November 5, 2012, Arnold's cell was searched for contraband. (ECF No. 51, ¶¶ 27, 28.) He also maintains that during the attack at breakfast on November 5, 2012, Inmate Arnold yelled, "I'm going to kill you, rat." (ECF No. 51, ¶ 29.)

Plaintiff states that in an interview after the attack, he explained to prison officials that Inmate Arnold attacked him because he believed Plaintiff informed on him. (ECF No. 51, ¶ 31.)

4

Plaintiff does not identify these prison officials, but he states that they told him that they would protect him from Inmate Arnold. (ECF No. 51, ¶ 32; ECF No. 58, ¶¶ 31-21.) According to Plaintiff, he met with Lieutenant Shrader the next day, and he assured Plaintiff that he would put a separation on Inmate Arnold. (ECF No. 51, ¶ 33.) However, Lieutenant Shrader maintains that he never made such a promise because he cannot unilaterally issue a separation, and he cannot recall whether he or Lieutenant Grego conducted the investigation pertaining to the altercation on November 5, 2012. (ECF No. 58, ¶ 33.)

Plaintiff states that on December 11, 2012, he informed his counselor that Inmate Arnold was threatening to kill him. (ECF No. 51, ¶ 34.) He counselor allegedly informed him that he did not have a separation from Inmate Arnold and advised that Plaintiff send his unit manager, Lindley, a request for a separation.[3] (ECF No. 51, ¶ 35.)

It is not disputed that Plaintiff sent request slips to Lindley on December 17, 2012, January 6, 2013, and March 18, 2013 and that she did, in fact, forward the request slips to security. (ECF No. 51, ¶¶ 37- 43; ECF No. 58, ¶¶ 37-43.) It is disputed, however, that Plaintiff approached Lindley and verbally informed her that he was receiving threats from Inmate Arnold and feared for his life should the two come into contact again. (ECF No. 51, ¶ 45; ECF No. 58, ¶ 45.) It is also disputed that Lindley replied that she didn't know what Plaintiff was talking about

---

[3] Defendants claim that as Unit Managers, neither Lindley nor Macknair had the authority to grant a separation of inmates. (ECF No. 45, ¶ 2.) While Plaintiff does not deny that such authority is the primary responsibility of the security department, Plaintiff points out that the Unit Managers do have the ability to initiate placement in administrative custody or self-lock up, place the inmate in a single cell, move him to another unit or suggest a transfer to another institution, as Lindley herself stated in her deposition. (ECF No. 51, ¶ 2.)

Defendants state that Plaintiff had the option to take self-lock up, which would have been granted to him had he requested it, but he chose not to make the request. (ECF No. 45, ¶ 14.) However, Plaintiff states that at no time did any Defendant or other correctional official propose this option to him, but it would have required him to submit to solitary confinement for an indefinite period outside of his control. (ECF No. 51, ¶ 14.)

5

and instructed him to stop sending request slips and talk to his counselor about the issue. (ECF No. 51, ¶ 46; ECF No. 58, ¶ 46.) According to Lindley, she does not remember Plaintiff or any conversations she had with him. (ECF No. 51, ¶ 47; ECF No. 58, ¶ 47.)

As to the investigation into Inmate Arnold's assault on Plaintiff, it is not disputed that Inmate Arnold remained in administrative custody pending the investigation. (ECF No. 58, ¶ 50.) However, it is disputed as to what occurred in the interview Plaintiff had with Lieutenant Shrader on March 26, 2013. Plaintiff maintains that Lieutenant Shrader instructed him to write another request for separation, which he did, but Shrader maintains that he requested that Plaintiff provide a statement to the security department, not a request for separation. (ECF No. 51, ¶ 51; ECF No. 58, ¶ 51.) Plaintiff states that Lieutenant Shrader informed him that he would get the separation and that Inmate Arnold would not be in the general population with him; however, Lieutenant Shrader states that he told Plaintiff that the security department was looking into the claims and that a determination would be made whether or not to issue a separation. (ECF No. 51, ¶ 52; ECF No. 58, ¶ 52.) Lieutenant Shrader admits that he told Plaintiff that Inmate Arnold would be housed in administrative custody during the pendency of the investigation so that the two inmates would not cross paths. (ECF No. 58, ¶ 52.) However, Plaintiff states that Lieutenant Shrader told him to "man-up" because the requests were unnecessary paperwork. (ECF No. 51, ¶ 53.)

According to Plaintiff, two days after the interview, Lieutenant Shrader approached him on the walkway and told him that he was placing a separation on Inmate Arnold. (ECF No. 51, ¶ 54.) He thus requested that Plaintiff drop his grievance or at least not file an appeal once the grievance was denied. (ECF No. 51, ¶ 55.)

Plaintiff states that two of Inmate Arnold's associates approached him and told him that they were informed by Lieutenant Shrader that Plaintiff was the reason that Inmate Arnold could not get out of the RHU.  (ECF No. 51, ¶ 57.)  Lieutenant Shrader denies making such statements to Inmate Arnold's associates because he would not discuss sensitive topics like that in front of other inmates.  (ECF No. 51, ¶ 57.)  The two associates threatened Plaintiff with injury, explained that they had a deal worked out with Lieutenant Shrader, and stated that Plaintiff should do what Lieutenant Shrader told him to when he visited Plaintiff at work.  (ECF No. 51, ¶ 58.)  The next day, Lieutenant Shrader visited Plaintiff at work and said, "I heard we're going to make this go away.  I heard you're going to man-up."  (ECF No. 51, ¶ 59.)  After this, Inmate Arnold's associates repeatedly used threats of physical violence to terrorize and extort money from Plaintiff.  (ECF No. 51, ¶ 60.)

Plaintiff states that the week Inmate Arnold was due to be released from the RHU, Lieutenant Shrader called him to security and again asked him if he was ready to "man-up." (ECF No. 51, ¶ 61.)  Plaintiff told Lieutenant Shrader that Inmate Arnold's associates were still threatening and extorting money from him.  (ECF No. 51, ¶ 62.)  Plaintiff states that Lieutenant Shrader was irritated and said that Inmate Arnold's associates assured him that Plaintiff would be okay and he was ready to let Inmate Arnold out.  (ECF No. 51, ¶ 63.)  On the other hand, Lieutenant Shrader denies knowing anything about Inmate Arnold's intentions toward Plaintiff. (ECF No. 51, ¶ 63.)  Plaintiff states that he agreed to write the April 22, 2013 statement explaining that he had no trouble with Inmate Arnold because of the pressure he felt from Inmate Arnold's associates and Lieutenant Shrader.  (ECF No. 51, ¶¶ 15, 64.)  However, Lieutenant Shrader denies influencing or coercing Plaintiff into writing the statement.  (ECF No. 45, ¶ 16; ECF No. 51, ¶ 64.)

Plaintiff alleges that sometime in May 2013, he had an argument with Nurse McAnany, his boss in the medical department. (ECF No. 51, ¶ 66.) On May 29, 2013, while Plaintiff was at work, Lieutenant Shrader called him to security to ask about this argument. (ECF No. 51, ¶ 67.) At this meeting, Plaintiff again asked for a separation, but Lieutenant Shrader told him to calm down and that nothing would happen. (ECF No. 51, ¶ 68.) According to Plaintiff, he was told by another inmate that Nurse McAnany was telling other prisoners in medical that Plaintiff was a rat and that he was working with security. (ECF No. 51, ¶¶ 21-23, 69, 70.) This other inmate also told Plaintiff that the allegations had reached Inmate Arnold. (ECF No. 51, ¶ 71.) Nurse McAnany ardently denies ever calling Plaintiff a snitch or discussing Plaintiff with other inmates, and maintains that he was not aware of any issues that Plaintiff was having with other inmates, including security concerns about Inmate Arnold. (ECF No. 45, ¶¶ 21-25; ECF No. 58, ¶¶ 69, 70.)

Plaintiff alleges that in early June 2013, Inmate Arnold and his associates stopped him and told him that he needed to compensate them for their suffering gambling business.[4] (ECF No. 51, ¶ 72.) They also told him that everyone in the prison now knew he was a rat. (ECF No. 51, ¶ 73.) They made it very clear that Plaintiff's life would be in danger if he did not comply. (ECF No. 51, ¶ 74.) Plaintiff states that the security department was aware that there was a rumor in the prison that he was a rat or a snitch. (ECF No. 51, ¶ 75.)

Plaintiff states that the following day, he met with Unit Manager Macknair and Nurse McAnany for a job removal meeting. (ECF No. 51, ¶ 76.) At the job removal meeting, Plaintiff told Macknair and Nurse McAnany that Inmate Arnold threated him the day before and he needed an immediate separation for his safety. (ECF No. 51, ¶ 77.) Plaintiff also informed

---

[4] Plaintiff states that this occurred in June 2012, but this appears to be a typo.

Macknair that Nurse McAnany was spreading a rumor that Plaintiff was a snitch to other inmates. (ECF No. 51, ¶ 78.) Plaintiff stated that he did not know who to trust and that he was using the meeting as a chance to get help, but Macknair stopped Plaintiff and told him that the meeting only concerned Plaintiff's employment in the medical department. (ECF No. 51, ¶¶ 79, 80.) Plaintiff responded, "Sir, he is going to jump me again," but Macknair told Plaintiff that he did not care and advised Plaintiff to send him a request slip. (ECF No. 51, ¶¶ 81, 82.) While Macknair does recall Plaintiff saying something about threats, he assumed it pertained to other inmates working in the medical department and instructed Plaintiff to contact security. (ECF No. 58, ¶ 77.)

It is not disputed that Plaintiff sent Macknair a request slip asking for a separation from Inmate Arnold on June 9, 2013, (ECF No. 51, ¶ 83; ECF No. 58, ¶ 83), and another request slip on June 19, 2013, asking to check on the status of his separation request, (ECF No. 51, ¶ 87; ECF No. 58, ¶ 87). It is also not disputed that Plaintiff never received a response from Macknair on either request. (ECF No. 51, ¶ 88; ECF No. 58, ¶ 88.)

Additionally, it is not disputed that Plaintiff sent a request slip to Ms. Sokol in Inmate Employment asking for assistance in addressing the issues he raised at the employment hearing, (ECF No. 51, ¶ 85; ECF No. 58, ¶ 85), or that he sent a request slip to Deputy Winfield seeking urgent attention because he believes his life was in immediate danger, (ECF No. 51, ¶ 89; ECF No. 58, ¶ 89).

Further, it is not disputed that on July 11, 2013, Plaintiff was in a second altercation with Inmate Arnold. (ECF No. 51, ¶ 105; ECF No. 58, ¶ 105.) Plaintiff states that he did not fight back during this altercation, and that Inmate Arnold knocked him unconscious by picking him up, slamming him to the ground, and repeatedly kicking him in the head. (ECF No. 51, ¶¶ 105,

106.) After the assault, Plaintiff was admitted into the infirmary for three and a half days. (ECF No. 51, ¶ 108.)

Finally, it is not disputed that on July 12, 2013, Captain Haywood responded to Plaintiff's request slip that was addressed to Deputy Winfield, wherein he stated that there was evidence that the fight with Inmate Arnold the previous day was staged to facilitate a transfer. (ECF No. 51, ¶¶ 91, 92; ECF No. 58, ¶¶ 91, 92.) On July 26, 2013, Plaintiff filed a grievance regarding the security department's failure to protect him from this second assault by Inmate Arnold, (ECF No. 51, ¶ 109; ECF No. 58, ¶ 109), and, during the investigation into this grievance, Defendants and members of the security department stated that they believed the assault was a set up to obtain money, (ECF No. 51, ¶ 111; ECF No. 58, ¶ 111).

In his deposition, Captain Haywood stated that he "knew that [Plaintiff] kept sending request slips, and he kept . . . trying to get separated from Inmate Arnold." (ECF No. 51, ¶ 93; ECF No. 58, ¶ 93.) However, Captain Haywood explained that he assigned Lieutenant Shrader to investigate Plaintiff's claims and Shrader relayed to him that Plaintiff was "cool" and did not want to take self-lock up. (ECF No. 58, ¶ 93; ECF No. 52-3, p.34.) Plaintiff states that he was not aware of the self-lock up option until the investigation into his July 26, 2013 grievance, (ECF No. 51, ¶ 110), but Defendants maintain that Plaintiff was familiar with the self-lock up option as he explained to Captain Price, who provided the initial review response to Plaintiff's grievance, (ECF No. 58, ¶ 110).

## II. Standard of Review

Summary judgment is appropriate if, drawing all inferences in favor of the nonmoving party, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Summary judgment may be

granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The moving party bears the initial burden of identifying evidence, or the lack thereof, which demonstrates the absence of a genuine issue of material fact. Nat'l State Bank v. Fed. Reserve Bank of New York, 979 F.2d 1579, 1581-82 (3d Cir. 1992) (citing Celotex, 477 U.S. at 323-25). Once that burden has been met, the nonmoving party may not rest on the allegations in the complaint, but must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (quoting FED. R. CIV. P. 56(e) (1963). *See also* Orsatti v. New Jersey State Police, 71 F.3d 480, 484 (3d Cir. 1995) ("plaintiff cannot resist a properly supported motion for summary judgment merely by restating the allegations of his complaint, but must point to concrete evidence in the record that supports each and every essential element of his case.") (citing Celotex, *supra*).

An issue is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Finally, while any evidence used to support a motion for summary judgment must be admissible, it is not necessary for it to be in admissible form. *See* FED. R. CIV. P. 56(c)(2); Celotex, 477 U.S. at 324; J.F. Feeser, Inc., v. Serv-A-Portion, Inc., 909 F.2d 1524, 1542 (3d Cir. 1990).

## III. Discussion

As stated in Plaintiff's Amended Complaint, "Defendants Shrader, Lindley, Haywood and Macknair knew of the immediate serious danger posed to [Plaintiff] but deliberately disregarded this knowledge and refused to take any action that would have protected [Plaintiff]

11

from harm, thereby violating his Eighth and Fourteenth Amendment rights under the United States Constitution." (ECF No. 2, ¶ 127.) As to Defendant McAnany, Plaintiff alleges that his "intentional disclosure of [Plaintiff's] potential status [as] a snitch constitutes deliberate indifference to [Plaintiff's] personal safety, thereby violating his Eighth and Fourteenth Amendment rights under the United States Constitution." (ECF No. 2, ¶ 129.)

The United States Supreme Court has stated that not "every injury suffered by one prisoner at the hands of another . . . translates into a constitutional liability for prison officials responsible for the victim's safety." Farmer v. Brennan, 511 U.S. 825, 834 (1994). However, "[b]eing violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" Id. (quoting Rhodes v. Chapman, 452 U.S. 337, 345 (1981)).

In order for a prison official to violate the Eighth Amendment, two requirements must be met. First, the deprivation alleged must be, objectively, "sufficiently serious," id. (citing Wilson v. Seiter, 501 U.S. 294, 298 (1991)), and when the case involves a claim that prison officials failed to prevent harm, the plaintiff "must show that he is incarcerated under conditions posing a substantial risk of serious harm," id. (citing Helling v. McKinney, 509 U.S. 25, 35 (1993)). Second, the prison official must have a "sufficiently culpable state of mind," Wilson, 501 U.S. at 297, and in prison-condition cases, that state of mind is one of "deliberate indifference" to inmate health and safety, id. at 302-03.

"Deliberate indifference" in this context is a subjective standard: "the prison official-defendant must actually have known or been aware of the excessive risk to inmate safety." Beers-Capitol v. Whetzel, 256 F.3d 120, 125 (3d Cir. 2001). It is not sufficient that the official should have known of the risk. Id. at 133. A plaintiff can, however, prove an official's actual

12

knowledge of a substantial risk of his safety "in the usual ways, including inference from circumstantial evidence." Farmer, 511 U.S. at 842. In other words, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." Id.

Prison officials may escape liability for deliberate indifference claims in several ways. They "might show, for example, that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew of the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." Id. at 844. "In addition, prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." Id. "Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable" on a failure-to-protect claim. Id. at 845; *see also* Hamilton v. Leavy, 117 F.3d 742, 746 (3d Cir. 1997) (noting that prison officials have "a duty . . . to take reasonable measures to protect prisoners from violence at the hands of other prisoners") (quotation marks omitted).

### A. **Defendants Lindley and Macnair**

Plaintiff alleges that Defendants Lindley and Macnair knew of the immediate danger that Inmate Arnold posed, and that Plaintiff feared for his safety, but they were deliberately indifferent to a substantial risk of harm when they failed to take all available steps to protect him. On the other hand, Defendants claim that they are entitled to summary judgment because neither of them had the authority to grant a separation and both of them referred Plaintiff to the security department, which they claim was the only department that could grant a separation. In response, Plaintiff states that Defendants cannot avoid liability by alleging they lacked the authority to institute a separation because, as unit managers, both of them had certain available

13

avenues of recourse at their disposable to ensure his safety. Plaintiff argues that at a minimum, this creates a factual dispute as to what remedial actions Defendants Lindley and Macknair could have taken to keep him safe from Inmate Arnold.

The question boils down to whether Defendants Lindley and Macknair knew that Inmate Arnold posed an excessive risk to Plaintiff's safety, and, if so, whether they reasonably responded to that risk or were deliberately indifferent to that danger. Defendants do not seem to argue that they were unaware of such a risk, but they do maintain that they are entitled to summary judgment because they did not have the authority to grant a separation and they responded reasonably to Plaintiff's safety concerns. Specifically, Defendant Lindley forwarded Plaintiff's three inmate request slips to the security department and Defendant Macknair directed Plaintiff to relay his concerns to the security department following his job staffing. Defendant Macknair also alleges that after the staffing was over, he reached out to Captain Haywood, the security captain, to let him know that soon he would be hearing from Plaintiff.

The facts in this case are remarkably similar to those in <u>Mikell v. Thompson</u>, 1:11-cv-388, Report and Recommendation Denying Defendants' Motion for Summary Judgment (M.D. Pa. Sept. 17, 2014) (ECF No. 188), adopted on December 15, 2014 (ECF No. 129). In that case, the defendants sought to avoid liability by arguing that they all individually lacked the authority to place the inmate who had attacked the plaintiff in Z-Code status. In response to this argument, the court stated:

> While it may be true as a matter of Department of Corrections policy that these officials could not individually instigate a Z-Code status and prevent any encounter between Middleton and Mikell, Mikell has shown that these officials had other avenues available to them to avoid confrontations between Middleton and prospective cellmates. This evidence, at a minimum, creates a factual dispute regarding what remedial actions could feasibly have been undertaken by the supervisory officials charged in this complaint . . . .

14

Id. at pp.22-23. Such is the case here.

Plaintiff maintains that Defendants Lindley and Macknair had other available avenues to them to ensure his safety. For example, as testified to by Defendant Lindley, Plaintiff alleges that she could have initiated administrative custody procedures, moved Inmate Arnold to another unit or recommended that he be transferred to another institution. Like Mikell, the availability of these remedial actions create a dispute of material fact as to whether Defendants Lindely and Macknair were deliberately indifferent to Plaintiff's safety by failing to take reasonable action to avert the excessive risk posed by Inmate Arnold. As such, summary judgment will be denied.

### B. Defendants Haywood and Shrader

As with Defendants Lindley and Macknair, Plaintiff alleges that Defendants Haywood and Shrader knew of the immediate danger that Inmate Arnold posed, and that he feared for his safety, but they deliberately disregarded this knowledge and failed to take action to protect him. However, Defendants maintain that they investigated Plaintiff's concerns about Inmate Arnold, which they contend would have included conducting interviews and reviewing histories of inmates, and that had Plaintiff truly feared for his safety, he would have taken self-lock up.[5] They also contend that Inmate Arnold remained in the RHU pending the investigation and they only let him back into general population after Plaintiff provided them with a written statement declaring that he no longer felt threatened by Arnold and Arnold provided a written statement stating that he did not have any ill-will toward Plaintiff. Thus, Defendants maintain that their

---

[5] Defendant Haywood testified that he remembered Plaintiff after reviewing paperwork, and that he distinctly recalled assigning Defendant Shrader to interview him. He also distinctly remembered Defendant Shrader reporting that Plaintiff was "cool" and did not want to take self-lock up, which Defendant Haywood stated was a big factor in determining whether an inmate really believes he is in fear. He also testified that if an inmate does not want to take self-lock up, but continues to say that they are in danger, security will have them write a statement saying that they no longer feel in danger and wish to remain in general population.

actions were appropriate and reasonable under the circumstances and there is no evidence that they ignored an excessive risk of harm.

On the other hand, Plaintiff maintains that there is a material dispute of fact as to whether Defendants Haywood and Shrader were aware of the substantial risk Inmate Arnold posed to Plaintiff, and also whether these Defendants took reasonable steps to ameliorate the risk to Plaintiff's safety. For example, Plaintiff points to the multiple requests slips that he sent to Defendant Haywood wherein he asked for a separation because he feared for his safety from Inmate Arnold. When Defendant Haywood was deposed, he stated that he remembered that Plaintiff kept sending the requests slips, but that Defendant Shrader, whom he assigned to investigate the matter, told him that Plaintiff was "cool" and did not want to take self-lock up, an option Plaintiff states he was never informed of. Plaintiff, however, maintains that he spoke with Defendant Shrader on numerous occasions and informed him that he was fearful for his life if he did not receive a separation. From Plaintiff's perspective, Defendant Shrader didn't simply fail to act, at times it seemed that Defendant Shrader was working with those aiming to harm him.[6] Additionally, when it comes to the steps the two Defendants took to ameliorate the risk to Plaintiff's safety, Plaintiff points out that they don't remember what actions they took, if any.

Defendants primarily rely on the April 22, 2013 statement Plaintiff provided to security stating that he no longer believed Inmate Arnold wanted to harm him. However, Plaintiff claims

---

[6] Plaintiff declares that Defendant Shrader told Inmate Arnold's associates that Plaintiff was the reason Inmate Arnold could not get out of the RHU and that they had worked out a deal with Defendant Shrader. Plaintiff states that Inmate Arnold's associates then threatened him and told him that he should do whatever Defendant Shrader told him to do. The following day, Defendant Sharder met with Plaintiff and said, "I heard we're going to make this go away. I heard you're going to man-up." Plaintiff states that the week Inmate Arnold was supposed to be released from the RHU, Defendant Shrader asked Plaintiff again if he was ready to "man up." Plaintiff told Defendant Shrader that Inmate Arnold's associates were still threatening and extorting money from him, and then Shrader got irritated but assured Plaintiff that he would be okay.

that he only completed this statement due to threats he received from associates of Inmate Arnold and an impression that Defendant Shrader was working with those inmates. He also claims that he felt pressure from Defendant Shrader to drop his request for a separation. In response, Defendant Shrader maintains that he never coerced Plaintiff into dropping his request for a separation. Nevertheless, Plaintiff continued to express his fear even after he completed the statement. Once was in a meeting with Defendant Shrader on May 29, 2012, and at least twice in request slips that were forwarded to Defendant Haywood in June and July.

There are clearly genuine issues of fact as to whether Defendants Haywood and Shrader were aware of the significant risk that Inmate Arnold posed to Plaintiff and whether they reasonably responded to that risk. Such issues include, but are not limited to, whether it was explained to Plaintiff that he had the option of self-lock up, something that Defendant Haywood appeared to heavily rely on in concluding there was no reasonable threat to Plaintiff's safety; whether Defendant Shrader intimidated or coerced Plaintiff into dropping his request for a separation and writing the statement that he no longer felt threatened by Inmate Arnold; the reasonableness of their actions despite Plaintiff's repeated requests for a separation, even after he wrote the statement; and whether the second assault between Plaintiff and Inmate Arnold was, in fact, staged, which is a central issue to this case. As such, summary judgment will be denied.

### C. Defendant McAnany

Finally, Plaintiff claims that Defendant McAnany, a nurse and Plaintiff's work supervisor in the infirmary, was deliberately indifferent to Plaintiffs safety by intentionally disclosing Plaintiff's potential status as a snitch. According to Plaintiff, multiple inmates reported to him that they had either overheard Defendant McAnany refer to him as a snitch, or said it to them directly.

Defendant McAnany disputes Plaintiff's allegations.  He claims that he never discussed Plaintiff with other inmates, since he would never have a reason to have such conversations, and would have no way of knowing whether Plaintiff was, in fact, a confidential informant because that information is not available to him.

"Labeling an inmate as a snitch may give rise to an Eighth Amendment violation if the prison official acted with deliberate indifference to a substantial risk of serious harm to the inmate."  Tabb v. Hannah, No. 1:10-CV-1122, 2012 WL 3113856, at *6 (M.D. Pa. July 30, 2012) (citing Benefield v. McDowall, 241 F.3d 1267, 1270 (10th Cir. 2001).  Courts have found that when an inmate is labeled as a snitch, it may endanger and pose a substantial risk to that inmate's safety.  *See e.g.*, Irving v. Dormire, 519 F.3d 441, 451 (8th Cir. 2008) ("[A]n inmate who is considered a snitch is in danger of being assaulted by other inmates."); Hamilton v. Leavy, 117 F.3d 742, 747 (3d Cir. 1997) (finding that knowledge of an inmate's branding as a snitch posed an imminent threat); Miller v. Leathers, 913 F.2d 1085, 1088 n.* (4th Cir. 1990) ("[I]t is impossible to minimize the possible consequences to a prisoner of being labeled a snitch.")

The outcome of this claim turns on credibility, something that the Court cannot decide in reviewing a motion for summary judgment.  El v. Southeastern Pennsylvania Transp. Authority, 479 F.3d 232, 237-38 (3d Cir. 2007) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  Whether Defendant McAnany referred to Plaintiff as a snitch knowing that this could jeopardize Plaintiff's safety is a triable issue of fact.  Therefore, summary judgment will be denied.

## IV. CONCLUSION

For the aforementioned reasons, the Motion for Summary Judgment (ECF No. 43) filed by Defendants will be denied. A separate Order will issue.

Dated: March 16, 2017.

/s/ Lisa Pupo Lenihan
Lisa Pupo Lenihan
United States Magistrate Judge

cc: Counsels of record
*Via CM/ECF Electronic Mail*

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANDREW BROWN, | ) | |
| | ) | Civil Action No. 14 – 1085 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Magistrate Judge Lisa Pupo Lenihan |
| | ) | |
| LIEUTENANT SHRADER, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

# ORDER

**AND NOW**, this 16th day of March, 2017,

**IT IS HEREBY ORDERED** that the Motion for Summary Judgment filed by Defendants Shrader, Haywood, Lindley, Macknair, and McAnany (ECF No. 43) is **DENIED**.

/s/ Lisa Pupo Lenihan
Lisa Pupo Lenihan
United States Magistrate Judge


cc: Counsels of record
*Via CM/ECF Electronic Mail*